**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ROBERT EUGENE ROLAND, JR., and ELIZABETH ROLAND,** | § | **Case No. 24-70029-smr** |
| | § | **Chapter 7** |
| | § | |
| **Debtors.** | § | |

| | | |
|---|---|---|
| **THREE GLOBAL, LLC, JESSE DICKENS, REED SHAHAN, AND CHUCK DORRITY,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Adv. Pro. No. 25-07002-smr** |
| **v.** | § | |
| | § | |
| **ROBERT E. ROLAND, JR., ELIZABETH ROLAND, and TINA ROLAND,** | § | |
| | § | |
| **Defendants.** | § | |

**FIRST AMENDED[1] COMPLAINT TO DETERMINE THE DISCHARGEABILITY OF DEBT AND OBJECTION TO DISCHARGE**

Three Global, LLC ("Three Global"), Jesse Dickens ("Dickens"), Reed Shahan ("Shahan") and Chuck Dorrity ("Dorrity" and, together with Three Global, Dickens and Shahan, the

[1] The Plaintiffs herein filed their *Complaint To Determine the Dischargeability of Debt and Objection to Discharge* [Adv.D.E. 1] (the "Complaint"), initiating this Adversary Proceeding, on March 20, 2025. Under Rule 15(a)(1)(A) and (B) of the FEDERAL RULES OF CIVIL PROCEDURE (the "Rules"), a party may amend a pleading once as a matter of right within (a) 21 days after serving it, or (b) if the pleading is one which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whenever is earlier. Rule 15 applies to adversary proceedings, like this Adversary Proceeding, under Rule 7015 of the FEDERAL RULES OF BANKRUPTCY PROCEDURE (the "Bankruptcy Rules"). This First Amended Complaint is being filed under, and in accordance with, Rule 15(a)(1)(A) and (B) and Bankruptcy Rule 7015.

"Plaintiffs") (Dickens, Shahan and Dorrity, collectively, the "Individual Plaintiffs"), the Plaintiffs in the above-captioned adversary proceeding (the "Adversary Proceeding") and creditors and parties in interest in the above-captioned bankruptcy case (the "Bankruptcy Case") where Robert E. Roland, Jr. ("Robert") and Elizabeth Roland ("Elizabeth") are the Debtors (the "Debtors") in the Bankruptcy Case and, along with Tina Roland ("Tina" and, together with Robert and Elizabeth, the "Defendants") the Defendants in the Adversary Proceeding, and file their *First Amended Complaint to Determine Dischargeability of Debt and Objection to Discharge* (collectively, the "Amended Complaint") against both of the Debtors. In support of their Complaint, the Plaintiffs show this Court as follows:

## I. PRELIMINARY STATEMENT

1. By the time the Debtors filed their Bankruptcy Case, Robert was already adjudicated to be a fraudster and a thief. This is because this Bankruptcy Case was filed just two weeks after a trial in state court where Robert was a defendant, 9 days after Robert received a letter from the state court outlining the state court's ruling that he was a fraudster and a thief, and 5 days after the entry of a state court judgement adjudicating Robert to be a fraudster and a thief.

2. After the entry of the state court judgment adjudicating Robert to be a fraudster and a thief, the Debtors compounded Robert's fraud and thievery. They did this in several ways including, without limitation:

- *First*, on the date that Robert received the state court letter advising him of the state court's ruling that he was a fraudster and a thief, Robert transferred 6 parcels of real property to his son-in-law for the consideration of love and affection by virtue of a Gift Deed.

- *Second*, when the Debtors filed this Bankruptcy Case they did not list or schedule the Individual Plaintiffs as their creditors on their Bankruptcy Schedules or on their Bankruptcy Matrix, even though the Individual Plaintiffs were the beneficiaries of the state court judgment that adjudicated Robert to be a fraudster and a thief, and the Debtors did not list their

ownership and/or management interests in at least three different corporate entities and/or businesses.

- *Third*, the Debtors listed on their Bankruptcy Matrix a law firm that the Debtors knew was no longer the Plaintiffs' counsel and that had been replaced by another law firm over a year before and that had tried the state court lawsuit against Robert just two weeks before.

- *Fourth*, in answering a question in his Bankruptcy Schedules as to whether tyhe owned non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in a limited liability company, partnership, and joint venture, the Debtors checked the box "no" even though they had ownership interests in at least two separate corporate entities, one of which is the corporate Plaintiff here, Three Global, and the other being a related entity, TDR, and even though they had their own consulting business, Robert Roland Consulting.

- *Fifth*, in answering the questions on their Bankruptcy SOFA, the Debtors failed and refused to disclose the transfer of the 6 parcels of real property to their son-in-law for the consideration of love and affection under a Gift Deed 9 days before the Debtors filed this Bankruptcy Case, although there were at least two different questions where that information would have been responsive.

- *Sixth*, in answering their Bankruptcy SOFA, the Debtors failed and refused to disclose their ownership and/or control interests in at least two separate corporate entities over the past 4 years, one of which is the corporate Plaintiff here, Three Global, and the other being a related entity, TDR.

3. Robert may not be Lex Luther[2] or Professor Moriarty,[3] but he was still able to mastermind an enterprise that defrauded and stole from the Plaintiffs with the help of his son (who also filed for bankruptcy relief in Fort Worth, Texas, whose debts to the Plaintiffs were determined to be non-dischargeable, and who was denied a discharge) and other cronies and partners in crime. But, as the great boxer Joe Louis once said about one of his opponents, "[H]e can run but he can't hide." And that essentially sums up what happened to Robert. After years of Robert running an

[2] Lex Luther was the archenemy and nemesis of Superman.
[3] Professor Moriarty was the archenemy and nemesis of Sherlock Holmes.

operation that defrauded the Plaintiffs, his victims, the Plaintiffs, sued him in state court and obtained a judgment against him for, among other things, fraud and theft.

4. Ever the elusive one, Robert then ran, along with his current wife Elizabeth, into this Court seeking bankruptcy relief while, at the same time, attempting to obscure and camouflage his trail to prevent the Plaintiffs from following him and exercising and enforcing their rights against him under the Bankruptcy Code. Robert's efforts at evasion have all come to naught and he has nowhere else to escape to. With this Complaint, the Plaintiffs seek the same relief they requested and obtained against the Debtor's son in his bankruptcy case; the Plaintiffs ask for a determination that their debts against the Debtors are non-dischargeable and that the Debtors be denied a discharge. The Plaintiffs' evidence is overwhelming and this Court should not hesitate in awarding them that relief.

## II. PROCEDURAL BACKGROUND

5. On March 17, 2024 (the "Petition Date"), the Debtors filed their *Voluntary Petition For Relief* [D.E.1] under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"),[4] thereby initiating this Bankruptcy Case. Randy Osherow was the duly appointed and acting Trustee in this Bankruptcy Case.

6. The Debtors obtained their discharge in this Bankruptcy Case on August 13, 2024 when this Court entered its *Order Discharging Debtor* [D.E. 20]. This Bankruptcy was closed on August 14, 2024 [D.E. 21].

7. On January 13, 2025, the Plaintiffs filed their Motion and Brief For Order Reopening Bankruptcy Case [D.E. 24] (the "Motion to Reopen") wherein they sought an Order

[4] All of the section references contained in this Complaint shall refer to the Bankruptcy Code, unless otherwise indicated.

from this Court reopening this Bankruptcy Case. This Court granted the Motion to Reopen and on March 6, 2024 entered the *Order Reopening Bankruptcy Case* [D.E. 51].

8. This Court has jurisdiction over this Bankruptcy Case under 28 U.S.C. § 1334. This is a core proceeding under 28 U.SC. § 157(b). Venue of this Bankruptcy Case is proper before this Court in this District under 28 U.S.C. §§ 1408 and 1409. This is an adversary proceeding under Rules 7001(4) and (6) of the Federal Rules of Bankruptcy Procedure (the "Rules"). The statutory predicate for the relief requested in this Complaint include §§ 523(a)(2), (4) and (6) and 727(a)(2), (4) and (5).

## III. THE PARTIES

9. Plaintiff Three Global is a limited liability company organized under the laws of the State of Texas, with its office and principle place of business located in Howard County, Texas.

10. Plaintiff Dickens is an individual who resides in Howard County, Texas.

11. Plaintiff Shahan is an individual who resides in Tom Green County, Texas.

12. Plaintiff Dorrity is an individual who resides in Midland County, Texas.

13. Defendant Robert is an individual who resides at the address of 4419 E. County Road 60, Midland, Midland County, Texas 79705-9543. He shall be served with this Amended Complaint under the applicable provisions of Rule 7004 which authorize service on him by mailing a copy of the Summons and Complaint to him at his residential address or wherever else he may be found. Upon information and belief, the Robert was a shareholder, member, officer, director or otherwise governing person of TDR Services, Inc. ("TDR"), 365 Outdoors, Inc. ("365 Outdoors"), Ten 22 Consulting, Inc. ("Ten 22") and/or Industrial Oilfield Construction, LLC ("Industrial" and, together with TDR, 365 Outdoors, and Ten 22, "Robert's Companies") and at all material times relevant to the events in this matter was in direct control of the day-to-day

operations of Robert's Companies. In that capacity, Robert was integrally involved in all of the significant business activities of Robert's Companies, including all of the transactions described in this Complaint.

14. Defendant Elizabeth is an individual who resides at the address of 4419 E. County Road 60, Midland, Midland County, Texas 79705-9543. She shall be served with this Amended Complaint under the applicable provisions of Rule 7004 which authorize service on her by mailing a copy of the Summons and Complaint to her at his residential address or wherever else she may be found.

15. Defendant Tina is an individual who resides at the address of 2701 33rd Street, Snyder, Scurry County, Texas 79549. She shall be served with this Amended Complaint under the applicable provisions of Rule 7004 which authorize service on her by mailing a copy of the Summons and Complaint to her at his residential address or wherever else she may be found.

## IV. FACTUAL BACKGROUND

### A. THE PLAINTIFFS AND ROBERT FORM THREE GLOBAL AND BEGIN TO CONDUCT BUSINESS TOGETHER

16. Plaintiff Three Global was formed on May 2, 2008 by the filing of a *Certificate of Formation* with the Secretary of the State of Texas. In approximately 2013—desiring to branch out into a new field in the oil and gas industry because his roustabout business, TDR, was floundering—Robert induced Dickens, Shahan, and Dorrity to join Three Global in exchange for capital contributions and/or the provision of sweat equity.

17. Robert and his son, Robert E. Roland, III ("RER III"), represented that the purpose of Three Global would be to provide water-related oilfield services such as poly-piping, pit-lining, and pump and generator rentals, and that the Three Global water business would enjoy a synergistic relationship with TDR's existing roustabout business. Ultimately, Dickens, Shahan, and Dorrity

affiliated with Three Global in mid-2013, with Dickens providing extensive knowledge and industry connections for water-related sales and services, Dorrity providing valuable financial connections, and Shahan providing approximately $640,000 in capital funding.

18. Since June 19, 2013, Robert, RER III, Dickens, Shahan and Dorrity have been the only Members of Three Global which is owned with the following percentages:

| MEMBER | PERCENTAGE INTEREST |
|---|---|
| Robert E. Roland, Jr. | 23% |
| Robert E. Roland, III | 23% |
| Jesse Dickens | 23% |
| Reed Shahan | 23% |
| Chuck Dorrity | 8% |

19. Relevant to this matter is also the ownership of TDR. Prior to September 25, 2015, the ownership of TDR was as follows:

| MEMBER | PERCENTAGE INTEREST |
|---|---|
| Robert E. Roland, Jr. | 1/3rd |
| Robert E. Roland, III | 1/3rd |
| Tina Roland | 1/3rd |

20. As result of the Debtor's divorce from his first wife, Tina Roland ("Tina"), TDR's ownership on and after September 25, 2015 was as follows:

| MEMBER | PERCENTAGE INTEREST |
|---|---|
| Robert E. Roland, Jr. | 2/3rd |
| Robert E. Roland, III | 1/3rd |

21. Robert and his son, RER III, at all material times relevant to his matter and between 2013 and 2016 acted in concert in a scheme to transfer millions of dollars from Three Global to TDR.

22. Since it officially commenced operations in 2013, Three Global provided water-related oilfield services such as poly-piping, pit-lining, and pump and generator rentals. Robert, Dickens, Shahan, and Dorrity were all managers of Three Global. Shahan and Dorrity were passive

investors in Three Global, who exercised *de minimus* to no control over the day-to-day affairs of the Three Global, which suspended its active business operations as of approximately January or February 2019, but prior to such suspension, Dickens managed and supervised the company's field operations, while Robert and RER III completely controlled the administrative and financial aspects of Three Global's business. Robert and RER III, as early as 2014, were listed as the "managing members" in Public Information reports filed with the Texas Secretary of State. RER III signed the vast majority of checks and authorized virtually all of the financial transactions for both Three Global and TDR for the time period 2013 through 2016 until RER III disassociated with Three Global in approximately February of 2017. Between 2013 and 2015, Robert signed at least 50 to 100 different checks on behalf of Three Global totaling in excess of $800,000. More than half of these checks were written from Three Global to TDR.

### B. ROBERT AND HIS SON BEGIN AND PARTICIPATE IN THEIR CAMPAIGN TO FLEECE THE PLAINTIFFS

23. Beginning in approximately 2013 and continuing through at least February of 2017, Robert, acting in concert with Robert's Companies, RER III, and Jason Tinsley ("Tinsely"), took advantage of their positions of financial trust by engaging in a concerted scheme to plunder the assets of Three Global and defraud the Plaintiffs by (a) utilizing Three Global's assets for their own enrichment, (b) making dozens or hundreds of unauthorized, fraudulent, and self- dealing payments, and (c) ultimately usurping all of Three Global's business—resulting in millions of dollars of damages to the Plaintiffs.

24. From June 19, 2013 through December 31, 2018, Three Global showed operating losses during each fiscal year, and never made a single distribution to Dickens, Shahan, or Dorrity. Despite this fact, between July 22, 2013 and April 7, 2017, Robert and RER III caused Three Global to issue in excess of one hundred and fifty (150) checks, wires, and debits from Three

Global to TDR, resulting in the transfer of approximately $7 million from Three Global to TDR from June 19, 2013 through December 31, 2016 including without limitation, those shown in the *Summary of Checks, Wires, and Debits from Three Global to TDR* (the "Summary of Transfers to TDR"), a copy of which is attached as **Exhibit A**, and including, without limitation, those listed in the *Copies of Checks from Three Global to TDR* (the "Checks to TDR"), a copy of which is attached as **Exhibit B**, as well as other transfers and checks written to TDR to be shown at the trial of this matter. In addition, Three Global made various other highly suspicious transfers without the knowledge or consent of Dickens, Shahan and Dorrity and for non-legitimate business reasons to various parties other than TDR from 2013 through 2016.

25. Upon information and belief, many of these payments between 2013 and 2016 were for Three Global's "payroll" which would, in the ordinary course of normal business, correlate to actual employees, even though Three Global did not list any employees in its Texas Workforce Commission Reports until January of 2017. Three Global paid millions of dollars in "payroll" expenses during 2013 to 2016 despite Three Global having no employees of record with the Texas Workforce Commission during that time period. The first time that Three Global listed employees with the Texas Workforce Commission was in 2017. TDR is believed to have initially processed Three Global's payroll while a QuickBooks accounting system was set up for Three Global. However, even after Three Global's QuickBooks accounting system was set up and Three Global incurred monthly fees in connection with the same -- at the latest, January 9, 2014 to early 2017 Robert and RER III caused Three Global to issue at least $6,422,661.09 in checks, wires, and debits from Three Global to TDR, many millions of which were for "payroll" and in excess of $6.2 million in transfers from January 9, 2014 through the end of 2016. Over the slightly expanded date range of June 19, 2013 through December 31, 2016, Three Global paid in excess of $6.7

million dollars for payroll/labor and contract labor to TDR, all during a period of time when Three Global did not have any employees. These transfers were made without the knowledge or consent of the Plaintiffs and were not for legitimate business purposes or were inflated, overcharged or wholly illegitimate purposes as a scheme of Robert and RER III to funnel monies from Three Global to TDR.

26. More specifically, Three Global wrote millions of dollars in "payroll" checks to TDR and TDR significantly marked up the "payroll" charges such that Three Global paid far in excess of the contract labor amounts it should have paid to TDR, resulting in severe overpayment of payroll costs by Three Global from 2013 through 2016 in amounts in excess of $1.6 million and unjustly enriching TDR and its owners, Robert and RER III. In fact, because Three Global had not listed any employees in its federal tax returns or with any governmental authority, all amounts paid to TDR for "payroll" were highly suspect and, in reality, a fraudulent diversion of funds directly from Three Global to TDR that unjustly enriched TDR's owners, Robert and RER III.

27. Robert and RER III's fraudulent scheme did not begin and end with TDR. From September 28, 2015 to December 20, 2016, Robert and RER III caused Three Global to write at least twelve (12) checks from Three Global to 365 Outdoors — RER III's personal hunting and outdoor company—in an amount of at least $80,074.95. See the *Summary of Checks, Wires and Debits From Three Global to 365 Outdoors* (the "Summary of Transfers to 365 Outdoors"), a copy of which is attached as **Exhibit C**, and the *Copies of Checks From Three Global to 365 Outdoors* (the "Checks to 365 Outdoors"), a copy of which is attached as **Exhibit D**. All of these transfers were made without the knowledge or consent of the Plaintiffs, and for no legitimate purpose -- indeed, upon information and belief, 365 Outdoors was engaged in providing services related to

recreational hunting and associated outdoor activities, and Three Global never requested or received any such services from 365 Outdoors.

28. From June 26, 2013 to September 28, 2018, a sum of $624,581.12 was drawn also from Three Global's checking account in cash via ATM or counter withdrawals. Upon information and belief, all or a portion of these cash withdrawals, as well as other cash withdrawals between 2013 and 2016 were highly suspect and made without a legitimate business purpose and for the exclusive enrichment of Robert, Robert's Companies, Tinsley, and RER III. See the *Summary of Three Global Cash Withdrawals* (the "Cash Withdrawals Summary"), a copy of which is attached as **Exhibit E**.

29. While Robert's pattern of systematically looting Three Global continued uninterrupted from at least 2013 through 2016, a key period delineated below is particularly illustrative of the brazenness of his transgressions and scheme alongside RER III, Robert's Companies, and Tinsley.

30. First, from July 16, 2013 to January 16, 2014, Shahan provided Three Global with startup cash infusions aggregating $640,000. Over this time, Three Global's banking records show, in essence, that Shahan's contributions were being pulled out of Three Global's account as fast as they came in, in the form of cash withdrawals and checks to TDR. In fact, during this time period, at least $433,829 in checks were written to TDR from Three Global, and another $65,927 was withdrawn from Three Global's account in cash—an aggregate of $499,756, a sum constituting 75% of the amount invested by Shahan.

31. Second, bank records and public records/court filings appear to strongly suggest—if not conclusively demonstrate—that Robert and TDR used Three Global funds to satisfy obligations incurred in connection with Robert's 2015 divorce from his wife, Tina. Robert and

Tina's divorce proceeding was heard in Scurry County on July 27, 2015, and an *Agreed Final Decree of Divorce* (the "Divorce Decree") was entered on September 25, 2015. A copy of the Divorce Decree is attached as **Exhibit F**. The Divorce Decree provided, *inter alia*, that Robert would pay, as a part of the division of the Rolands' estate, the balance due on a promissory note (the "Note") executed by TDR in the original principal sum of $427,814.98.[5] On July 28, 2015—*the day after the Rolands' divorce hearing was held*—a cash withdrawal of $141,441.12 was made from Three Global's bank account.[6] TDR eventually paid off the Note on January 5, 2016, after receiving numerous other transfers from Three Global.[7]

32. Robert, RER III, TDR, and Ten 22, in addition to making the numerous fraudulent and unlawful transfers described above, also engaged in numerous other schemes to utilize and divert Three Global's funds and assets for their own exclusive benefit.

33. Robert and RER III regularly paid TDR and/or Ten 22 employees for TDR and/or Ten 22 work using Three Global funds, including employees Josh New, Mike Spec, and Billy Stallings, who were paid as employees of Three Global despite performing all or nearly all of their work for TDR and Ten 22. On at least one occasion, one of these employees, Josh New, stated that he sat in RER III's office while RER III and Robert fabricated fraudulent invoices to send to Three Global for payment. Further, Robert and RER III regularly utilized Three Global equipment and supplies to perform jobs on behalf of TDR and caused TDR to keep all proceeds of such work without compensating Three Global in any way. In multiple instances, Robert and RER III absconded with equipment titled to Three Global, and kept such equipment on premises owned or leased by TDR and/or Total Supply, and used such equipment solely in connection with TDR

5 Divorce Decree, **Exhibit F** herein, p. 7.
6 See the Cash Withdrawals Summary, **Exhibit E** herein.
7 See the Cash Withdrawals Summary, **Exhibit E** herein, and Summary of Transfers to TDR, **Exhibit A** herein.

and/or Total Supply work. In other instances, they damaged Three Global equipment doing work for TDR and then caused Three Global to pay for repairs to such equipment. Robert and RER III also caused Three Global to provide satellite phones for TDR employees and retain advertisers and consultants for TDR at Three Global's sole expense, despite the total lack of benefit to Three Global. Additionally, RER III utilized Three Global employees and funds to re-model a boutique business owned by his wife called the "Pink Pug."

34. In one particularly egregious case, Robert and RER III diverted several lucrative jobs for the Rock Oil Lease from Three Global to TDR. Not content to merely usurp the business, Robet and RER III then caused vendors, including Smith Industries, Inc., to bill hundreds of thousands of dollars of equipment, materials, and services to Three Global in connection with the Rock Oil Lease jobs, and caused Three Global to pay a substantial portion of these invoices -- despite the fact that all such costs were incurred solely by TDR and all benefit of such work inured solely to TDR. Three Global was ultimately involved in litigation arising from the Smith Industries, Inc. invoices left unpaid by TDR in connection with the Rock Lease Oil jobs. *See* Smith Industries, Inc. v. Three Global, LLC and TDR Services, Inc., Cause No. CV53240, in the 441st Judicial District Court, Midland County, Texas.

35. In another instance, RER III caused Three Global to lease a 2015 GMC Sierra 2500HD Denali and pay tens of thousands of dollars on the vehicle, before applying such payments towards a purchase option and titling the vehicle first in RER III's own name and later to TDR, without providing any reimbursement to Three Global. See the *2015 GMC Sierra 2500 HD Denali Lease Agreement*, a copy of which is attached as **Exhibit G**, and the *GMC Sierra 2500 HD Denali Registration Details*, a copy of which is attached as **Exhibit H**.

36. Robert and RER III further caused Three Global to make numerous illegitimate payments to Ten 22, purportedly for consulting services, when in reality such services were never provided.

37. Tinsley is a close associate of Robert and RER III, who participated with Robert and RER III in numerous joint business ventures. Tinsley, acting in concert with Robert and RER III, conspired to fraudulently divert funds and assets of Three Global for their own enrichment.

38. Upon information and belief, Tinsley and/or his staff drew salaries, wages, and/or benefits from Three Global in connection with work performed exclusively for the benefit of TDR and other entities. Tinsley also used Three Global assets and funds to perform work for TDR and/or Total Supply.

39. Furthermore—despite the fact that Three Global was not a customer of Total Supply -- Tinsley, acting, upon information and belief, in concert with Robert and RER III, caused Three Global to issue illegitimate payments to Total Supply aggregating at least $190,360.45. *See* the *Checks to Total Supply*, a copy of which is attached as **<u>Exhibit I</u>**.

40. In early 2017, Dickens, Shahan, and Dorrity became suspicious of Robert and RER III's operation of Three Global. When Robert and RER III learned of the suspicion of the other members of Three Global, they absconded from Three Global's offices with Three Global's computers, financial records, and vehicle/equipment titles. Upon information and belief, they intentionally did so to conceal their unlawful activity in the operation of Three Global.

41. Shortly thereafter, Robert and RER III ceased operation of Three Global altogether and funneled all of Three Global's business to TDR, Total Supply, Industrial Oilfield and/or other entities owned and operated by them. Thereafter, rather than merely providing roustabout services, TDR services expanded to include water-related oilfield services such as poly-piping, pit- lining,

and pump and generator rentals which were previously provided by Three Global. Similarly, Industrial Oilfield, which was formed by RER III and Tinsley in 2018 shortly after Robert and RER III's departure from Three Global, cannibalized much of Three Global's former business.

42. Robert, RER III, and Tinsley acted individually and as agents of the respective companies of TDR, Ten 22, 365 Outdoors, Industrial Oilfield and Total Supply in their respective roles as officers, directors, managers, members, majority owners, governing persons and employees of the foregoing companies at all times relevant to this matter to systematically defraud the Plaintiffs by transferring monies and property away from Three Global from 2013 through 2016, as described in at least the following transactions, in addition to many others to be shown at the trial of this matter:

- Three Global paid millions of dollars in wages, employee benefits, payroll tax and arbitrary and capricious mark-ups on "payroll" billed from TDR to Three Global at a time when Three Global had no employees.

- Removal by RER III of funds in excess of $141,000 in a single "other debit withdrawal from a branch/store" transaction from the Three Global operating bank account with a corresponding deposit on the same day into RER III and his wife Ashley Roland's personal bank account.

- Utilizing monies from Three Global and monies shifted from Three Global to TDR for the payoff of Robert's personal loans and TDR loans at First Bank & Trust in addition to the payoff of other obligations pertaining to the Debtor's 2015 divorce.

- Payments from Three Global to RER III's personal outdoor hunting and fishing company, 365 Outdoors, in excess of $80,000.

- Payments from Three Global to Tony Dry in excess of $150,000.

- "Owner Draws" purportedly from TDR to its owners, Robert and RER III, at least in the amount of and in excess of $400,000 during 2013 through 2016 which were reimbursed or transferred in whole or in part from Three Global to TDR at time when the other Three Global owners Dickens, Shahan, and Dorrity received no proportionate share of such "draws" or any distributions from Three Global. More specifically, Robert received Owner

Draws, vehicle reimbursements, office expense and shareholder distributions totaling in excess of $132,000 in a time period between December 2013 and April of 2016, with one-half of all the Owner Draws paid by Three Global. One-half of all Owners Draws paid to Robert and RER III were reimbursed by Three Global to TDR at a time when no owners' draws were paid to the other members of Three Global -- Dickens, Shahan, or Dorrity.

- Automotive truck payments on a 2013 Dodge Ram financed through First Financial Bank for Robert (promissory note signed by Robert as a manager of Three Global) at a time when Robert was also already receiving a monthly "auto allowance."

- Transfers or deposits to RER III's personal accounts of the bulk of monies of $386,000 which were purportedly obtained as an investment or loan for Three Global from Bill Stallings, when very little, if any of the funds were deposited into the Three Global bank account or utilized for the business of Three Global, but rather were used for the personal benefit and at the direction of RER III.

- Usurpations of corporate opportunities of Three Global wherein Robert and RER III coordinated the funneling and transferring of business opportunities of Three Global with Diamondback Energy, SM Energy, Trailridge, and Rock Oil to TDR and other companies and away from Three Global.

- Suspect transfers and payments from Three Global for what is known as the Rock Oil jobs of in excess of $1 million.

- Assignment of a factoring agreement for Three Global invoices, assigning the funds available from factoring Three Global invoices to TDR at the same time that Three Global made payments to the applicable factoring company.

- Vehicles paid for by Three Global but utilized by TDR.

- Checks made out to pay Three Global but deposited into the TDR operating bank account including but not limited to checks from Midland Oil and Gas.

- Booking the actual purchase of a ditcher transaction in QuickBooks as a "building sale" demonstrating the arbitrary, capricious and deceptive nature of Robert and RER III's bookkeeping practices.

- Other miscellaneous transfers for personal expenses such as fitness charges, charges at Gebo's (a hunting and ranch supply store), western clothing, $10,000 in an unspecified transfer with no general ledger entry, and such

transfers shown in the Three Global general ledger for the time period April of 2015 through December 22, 2015, totaling in excess of $14,000.

- Three Global paid monies to TDR for Blue Cross Blue Shield premiums for TDR's employee's insurance premiums during 2013 to 2016 at a time when Three Global had no employees.

- Many other transfers of equipment and monies away from Three Global that are to be proved at the trial of this matter all to the detriment of the Plaintiffs.

43. As a result of Robert, Robert's Companies, RER III and Tinsley's absconding with Three Global's books and records, their failure to produce a single document in discovery in related litigation, and the likely destruction of documents relevant to this matter, the Plaintiffs faced substantial hardship in bringing the claims stated herein. Ultimately, the Plaintiffs successfully retained a forensic accountant in January of 2019 and were able to compile evidence sufficient to support a case using bank records to which the Plaintiffs had access and other publicly available records. The Plaintiffs did not discover and could not have reasonably discovered the various nefarious transactions and misconduct of Robert acting in concert with Robert's Companies, RER III, and Tinsley prior to that time since the Plaintiffs had been effectively "shut out" by Robert from obtaining access to or knowledge of such facts and information.

44. As described above, and as to be further discovered or proven in this case, Robert acted in concert with TDR, 365 Outdoors, Ten 22, Industrial, RER III, and Tinsley to funnel millions of dollars away from Three Global from 2013 through 2017 all to the damage of the Plaintiffs, for which the Plaintiffs now bring this suit.

## C. The Plaintiffs Sued Robert, and Robert's Companies and Obtained a Multi-Million Dollar Judgment Against Them For Fraud and Theft

45. On September 19, 2019, the Plaintiffs filed suit against Robert, his son, RER III, 365 Outdoors, Ten 22, Total Supply, Industrial and Tinsley (the "Fraud Defendants") in Cause No. 53885 (the "Fraud Action") before the 118th Judicial District Court of Howard County, Texas

(the "118th"). A copy of the *Plaintiffs' First Amended Petition* (the "Fraud Petition") in the Fraud Action is attached as **Exhibit J**. In the Fraud Petition, the Plaintiffs alleged the following causes of action and remedies against the Fraud Defendants: (a) breach of fiduciary duty;[8] (b) breach of contract;[9] (c) tortious interference with an existing contract;[10] (d) civil theft;[11] (e) fraud by non-disclosure;[12] (f) common law fraud;[13] (g) violations of the Texas Deceptive Trade Practices Consumer Protection Act (the "DTPA");[14] (h) conversion;[15] (i) money had and received;[16] (j) unjust enrichment;[17] (k) declaratory judgment;[18] (l) the discovery rule;[19] (m) attorney's fees and costs;[20] (n) constructive trust;[21] and (o) temporary injunction.[22]

46. Trial of the Fraud Action took place on March 4and 5, 2024.

47. On March 8, 2024, the 118th sent the parties a letter ruling dated March 8, 2024 (the "State Court Letter") advising the parties in the Fraud Action of the Court's ruling and requesting that the Plaintiff's counsel draft a final judgment. The ruling was in favour of the Plaintiffs and against Robert, TDR, and 360 Outdoors. The ruling would not be against RER III because he had previously filed for bankruptcy relief and the automatic stay under § 362 prevented the 118th from ruling against him. A copy of the State Court Letter is attached as **Exhibit K**.

---

8 Petition, **Exhibit J** herein, ¶¶ 47-51, pp. 17-19.
9 Petition, **Exhibit J** herein, ¶¶ 52-62, pp. 19-21.
10 Petition, **Exhibit J** herein, ¶¶ 63-68, pp. 21-22.
11 Petition, **Exhibit J** herein, ¶¶ 69-76, pp. 22-23.
12 Petition, **Exhibit J** herein, ¶¶ 77-81, pp. 23-25.
13 Petition, **Exhibit J** herein, ¶¶ 82-85, pp. 25-27.
14 Petition, **Exhibit J** herein, ¶¶ 86-92, pp. 27-28.
15 Petition, **Exhibit J** herein, ¶¶ 93-96, pp. 28-29.
16 Petition, **Exhibit J** herein, ¶¶ 97-99, p. 29.
17 Petition, **Exhibit J** herein, ¶¶ 100-104, pp. 29-30.
18 Petition, **Exhibit J** herein, ¶¶ 105-110, pp. 30-31.
19 Petition, **Exhibit J** herein, ¶ 111, pp. 31-32.
20 Petition, **Exhibit J** herein, ¶¶ 112-113, p. 32.
21 Petition, **Exhibit J** herein, ¶ 114, p. 32.
22 Petition, **Exhibit J** herein, ¶ 116, p. 33.

48. On March 12, 2024, the 118th entered its *Final Judgment* (the "Fraud Judgment") in the Fraud Action. A copy of the Fraud Judgment is attached as **Exhibit L**. The Final Judgment awarded Dickens, Shahan and Dorrity damages against the Robert (TDR and 365 Outdoors) in the total amount of $3,947,914.42.[23] In the Final Judgment, the 118th made the following findings against the Debtor.

- 360 Outdoors and Robert **submitted fraudulent invoices** to [Three Global] in the amount of $81,570 which Three Global paid.[24]

- Robert **engaged in fraud** by allowing the submission of owner draws and requesting that Three Global pay the owner draws in the amount of $163,835 without the proper consent required by the Three Global regulations.[25]

- Robert **fraudulently transferred** money from Three Global to TDR in the form of payroll overcharges that TDR was not entitled to in the amount of $1,136,578.[26]

- Robert benefitted personally from the **fraudulent payroll overcharges** because he owned 66 2/3% of TDR.[27]

- Robert **tortiously interfered** with the contractual arrangement between Three Global and Rock Oil II, Inc. ("Rock Oil") and caused TDR to **usurp work** from Rock Oil in the amount of $1,303, 969.[28]

- Robert benefitted individually from the **tortious interference** with the Rock Oil contract because he owned 66 2/3% of TDR at the time of the **tortious interference**.[29]

- Three Global's value on December 31, 2016 should have been $4,625,000.[30]

---

23 Fraud Judgment, **Exhibit L** herein, p. 1.
24 Fraud Judgment, **Exhibit L** herein, p. 1 (emphasis added).
25 Fraud Judgment, **Exhibit L** herein, pp. 1-2 (emphasis added).
26 Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
27 Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
28 Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
29 Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
30 Fraud Judgment, **Exhibit L** herein, p. 2.

- As a result of **Robert's violations of the TEX. CIV. PRAC. REM. CODE § 134.001 -- § 134.005**, Three Global's value on December 31, 2018 was $0.[31]

- Because of the **fraudulent actions of Robert**, Three Global suffered a reduction in its enterprise value in the amount of $4,625,000.[32]

- **Robert committed theft** as defined by TEXAS CIVIL PRACTICE AND REMEDIES CODE (the "CPRC") § 134.001.[33]

- The damages resulting from **the theft of Robert** are the same damages as set forth in paragraphs 1-9 above.[34]

- In addition to the damages awarded in paragraphs 1-9 above, Jesse Dickens, Reed Shahan, and Chuck Dorrity are individually awarded an additional $1,000 each pursuant to CPRC § 134.005.[35]

- The Court finds that Dickens, Shahan, and Dorrity collectively owned 54% of Three Global and are entitled collectively to 54% of the damages found by this Court in paragraphs 1-9 above.[36]

- The Court finds that Robert **committed theft** as that term is defined under the Texas Theft Liability Act.[37]

49. Based upon these findings, the 118th ordered the following:

- Dickens, Shahan and Dorrity were awarded judgment against TDR, 360 Outdoors, and Robert, jointly and severally in the amount of $3,950,914.42 (which was comprised of $3,947,914.42 plus $3,000).[38]

- Dickens, Shahan and Dorrity were awarded judgment against TDR, 360 Outdoors, and Robert all court costs.[39]

- Dickens, Shahan and Dorrity were awarded pre-petition interest from February 1, 2017, at the highest rate allowed by law until the date of the Fraud Judgment.[40]

---

[31] Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
[32] Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
[33] Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
[34] Fraud Judgment, **Exhibit L** herein, p. 2 (emphasis added).
[35] Fraud Judgment, **Exhibit L** herein, p. 2.
[36] Fraud Judgment, **Exhibit L** herein, p. 3.
[37] Fraud Judgment, **Exhibit L** herein, p. 3 (emphasis added).
[38] Fraud Judgment, **Exhibit L** herein, p. 3.
[39] Fraud Judgment, **Exhibit L** herein, p. 3.
[40] Fraud Judgment, **Exhibit L** herein, p. 3.

- Dickens, Shahan and Dorrity were awarded post-judgment interest at the highest rate allowed by law from the date of the Fraud Judgment until paid.[41]

- All writs and processes for the enforcement and the collection of the Fraud Judgment may henceforth issue as necessary.[42]

- All other relief not expressly granted in the Fraud Judgment was denied.[43]

### D. Robert Fraudulently Transferred Six Tracts of Real Property To His Son-in-Law For the Consideration of Love and Affection in a Gift Deed

50. On February 9, 2019, the Debtor entered into a hand-written *Bill of Sale* (the "Bill of Sale"), a copy of which is attached as **Exhibit M**. The Bill of Sale had one paragraph that read as follows:

> I Robert E. Roland, Jr., February 09, 2019, award. Transfer, give 100% ownership and responsibility of the land I own in Scurry Co, Texas, free and clear of debt, to Terry Turner, Jr., and not be contested by anyone or family members. Property ID numbers 2351, 19426, 19427, 19428.[44]

The Bill of Sale was signed by Robert and Terry Turner, Jr. ("Turner"), his son-in-law,[45] and the witnesses Elizabeth Roland (the Debtor's second wife) and Jeremy Bryand (upon information and belief, Turner's brother-in-law).[46]

51. The Bill of Sale was not notarized and it was never filed in the Deed Records and, therefore, under well settled Texas law, it was not the proper mechanism to transfer real property. Because the Bill of Sale was never filed in the Deed Records, the Bill of Sale never appeared in the chain of title of the properties identified in the Bill of Sale. It was as if the Bill of Sale transferred nothing.

---

[41] Final Judgment, **Exhibit A** herein, p. 3.
[42] Final Judgment, **Exhibit A** herein, p. 3.
[43] Final Judgment, **Exhibit A** herein, p. 3.
[44] Bill of Sale, **Exhibit M** herein, p. 1.
[45] Bill of Sale, **Exhibit M** herein, p. 1.
[46] Bill of Sale, **Exhibit M** herein, p. 1.

52. Therefore, during the Fraud Action, Robert was still the owner of the real property that was never transferred from Robert to his son-in-law under the Bill of Sale and included the following 6 tracts of real property located in Scurry County, Texas (the "Real Property").

- **Tract 1:** Being a 3.326-acre tract of land in the NW/4 of Section 136, Block 97, H&TC RR Co. Survey, Abstract No. 2284, Patent No. 373, Volume 28-A, Scurry County, Texas;

- **Tract 2:** Being a 10.364-acre tract of land in the NW/4 of Section 136, Scurry County, Texas;

- **Tract 3:** Being a tract of land of Dunn in Scurry County, Texas, 94 x 120 feet in size and being a part of Section No. 88, Block No. 3, H&GN Ry. Co. Survey, Scurry County, Texas;

- **Tract No. 4:** Being a tract of land lying near the Northwest corner of the South One-third (1/3rd) of Section No. 88, in Block No. 3 of the H&GN Ry. Co., in the village of Dunn; and

- **Tract No. 5:** Being two (2) tracts of land out of the South One-third (S 1/3rd) of Section Number Eight-eight (88), Block No. Three (3), H&GN Ry. Co. Survey, Scurry County, Texas.

53. On the day Robert received the State Court Letter (March 8, 2024), but before the entry of the Fraud Judgment (March 12, 2024), Robert again attempted to transfer the Real Property to his son-in-law, Turner, for the consideration of love and affection. This transfer was accomplished by Robert executing a *General Warranty **Gift** Deed* (the "Gift Deed") (emphasis added), a copy of which is attached as **Exhibit N**. The

**E. THE DEBTORS FILED FOR BANKRUPTCY BUT OMITTED ANY MENTION OF THE REAL PROPERTY OR ITS TRANSFER AND OMITTED ANY MENTION OF THEIR OWNERSHIP IN ROBERT'S COMPANIES ON THEIR SOFA AND DID NOT PROVIDE NOTICE OF THEIR BANKRUPTCY CASE TO THE PLAINTIFFS**

54. As mentioned above, the Debtors initiated this Bankruptcy Case on March 17, 2024, five (5) days after the entry of the Fraud Judgment and 9 days after Robert's receipt of the State Court Letter. The Debtors' *Matrix* (the "Matrix"), a copy of which is attached as **Exhibit O**,

does not list any of the Individual Plaintiffs (even though they were the sole beneficiaries of the Fraud Judgment) or their addresses. The Matrix does, however, list Three Global (even though Three Global was not a beneficiary of the Fraud Judgment) at the address of 2403 25th Street, Snyder, Texas 79549-2315.

55. The Individual Plaintiffs and Robert were all members of Three Global. This can be seen from the Minutes of Special Meeting of Managers of Three Global, LLC, dated June 19, 2013, a copy of which is attached as **Exhibit P**. Three Global's *2023 Texas Franchise Tax Public Information Report*, a copy of which is attached as **Exhibit Q**, that was filed with the Texas Secretary of State on May 12, 2023 listed Three Global's mailing address as Post Office Box 3523, Big Spring, Texas 79721 and Three Global's Registered Agent as Dickens with a registered office address of 5201 E. Midway, Big Spring, Texas 79720. Although the individual Plaintiffs did not office out of Three Global's Snyder, Texas address, Robert previously did several years prior. In other words, the Debtors listed Three Global on their Matrix at an address that Robert previously worked at knowing full well that the Individual Plaintiffs did not work there and would not get notice of this Bankruptcy Case.

56. The Debtors' *Schedules of Assets and Liabilities* (the "Schedules") in this Bankruptcy Case [D.E. 1] (their "Schedules"), a copy of which are attached as **Exhibit R**, and which they signed under penalty of perjury, are noteworthy for the following reasons:

- The Schedules do not list the Real Property which Robert transferred to his son-in-law for the consideration of love and affection nine (9) days before.[47]

[47] Schedules, **Exhibit R** herein, Schedule A/B Part 1.

- In Part 4 Question No. 19 of the Schedules, which asks whether the Debtors owned non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in a limited liability company, partnership, and joint venture, the Debtors checked the box "no" even though they had ownership interests in at least two separate corporate entities, one of which is the corporate Plaintiff here, Three Global, and the other being a related entity, TDR, and even though they had their own consulting business, Robert Roland Consulting.[48]

- The Schedules list Three Global as an unsecured creditor with a claim of $3,947,914.42, where the boxes for "contingent," "unliquidated" and "disputed" were not checked, even though the Fraud Judgment was in favor of the Individual Plaintiffs and not Three Global.[49]

- The Schedules did not list the Individual Plaintiffs as unsecured creditors, despite the existence of the Fraud Judgment in the Fraud Action to the contrary.[50]

57. The Debtors' Statement of Financial Affairs in this Bankruptcy Case [D.E.1] (their "SOFA"), a copy of which are attached as **Exhibit S**, and which they signed under penalty of perjury, are noteworthy for the following reasons:

- In Part 4, Question No. 9, which asks whether within one (1) year before the Petition Date, whether the Debtors were a party in any lawsuit, court action or administrative proceeding, the Debtors listed the Fraud Action but checked the box indicating that the matter was still "pending," instead of the box indicating that the matter had "concluded."[51] With the entry of the Final Judgment and with there being no appeal of the Fraud Action, that matter had "concluded" and the Debtors indicating that the Fraud Action was "pending" was incorrect and false.

- In Part 5, Question No. 13, which asks whether **within two (2) years before the Petition Date**, whether the Debtors gave any **gifts** with a total value of more than $600 per person, the Debtors checked the box for "none."[52] With the Robert transferring the Real Property to his son-in-law for the consideration of love and affection, nine (9) days before the Debtors filed this Bankruptcy Case, the Debtors checking the box "none" was incorrect

48 Schedules, **Exhibit R** herein, Schedule A/B Part 4 No. 19. See also the *Assumed Name Records Certificate of Ownership For Unincorporated Business or Profession* that was executed by the Debtor on January 25, 2021 (the "Assumed Name Certificate"), a copy of which is attached as **Exhibit R-1**.

49 Schedules, **Exhibit R** herein, Schedule E/F Part 2 No. 4.11.

50 Schedules, **Exhibit R** herein, Schedule E/F.

51 SOFA, **Exhibit S** herein, Part 4 Question No. 9.

52 SOFA, **Exhibit S** herein, Part 5 Question 13 (emphasis added).

and false. This transfer was nothing other than a gift. The verity of this is made more obvious by the fact that the Deed has the word "**gift**" in its title, General Warranty **Gift** Deed.

- In Part 7, Question No. 18,which asks whether **within two (2) years before the Petition Date**, whether the Debtors sold, traded, or otherwise transferred any property to anyone, other than property transferred in the ordinary course of business or financial affairs, the Debtors checked the box for "no."[53] With Robert transferring the Real Property to his son-in-law for the consideration of love and affection, nine (9) days before the Debtors filed this Bankruptcy Case, the Debtors checking the box "no" was incorrect and false. This transfer was not in the Debtors' ordinary course of business or financial affairs.

- In Part 11, Question No. 27, which asks whether **within 4 years before the Petition Date**, whether the Debtors owned a business or have any of the following connections to any business (e.g., (a) a sole proprietorship or self-employed in a trade, profession, or other activity, either full time or part time; (b) a member of a limited liability company (LLC) or limited liability partnership (LLP); (c) a partner is a partnership; (d) an officer, director, or managing executive of a corporation; and/or (e) an owner of at least 5% of the voting or equity securities of a corporation), the Debtors checking the box "no" was incorrect and false. Robert was a Manager of Three Global and Three Global was duly organized and existing under the laws of the state of Texas within 4 years of the Petition Date.[54] Robert was a Director of TDR and TDR was duly organized and existing under the laws of the state of Texas within 4 years of the Petition Date.[55] And, in addition, the Debtors had his own consulting business, Robert Roland Consulting.[56]

### F. ROBERT'S SON FILED FOR BANKRUPTCY, HAD HIS DEBTS TO THE PLAINTIFFS DETERMINED TO BE NON-DISCHARGEABLE AND HAD HIS DISCHARGE DENIED AS A RESULT OF HIS MISCONDUCT COMPLAINED OF IN THE FRAUD ACTION

58. On March 2, 2024, RER III filed his *Voluntary Petition For Relief Under Chapter 13 of the Bankruptcy Code* [D.E. 1] in Case No. 24-40756-mxm, and his bankruptcy case was

---

53 SOFA, **Exhibit S** herein, Part 7 Question No. 18.

54 See Three Global's *Certificate of Formation For a Limited Liability Company*, dated May 2, 2008, a copy of which is attached as **Exhibit T**, and a summary of the filings regarding Three Global with the Office of the Secretary of State of Texas, a copy of which is attached as **Exhibit U**.

55 See TDR's Certificate of Formation of TDR Services, Inc., dated June 21, 2006, a copy of which is attached as **Exhibit V**, and a summary of the filings regarding TDR with the Office of the Secretary of State of Texas, copy of which is attached as **Exhibit W**.

56 Assumed Name Certificate, **Exhibit R-1** herein.

converted to chapter 7 on March 11, 2024 [D.E. 11]. His bankruptcy case was filed before the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

59. On August 1, 2024, the Plaintiffs initiated an adversary proceeding against RER III in Adversary Proceeding No. 24-04063-mxm. A copy of their *Complaint to Determine Claim, Dischargeability of Debt, and Objection to Discharge* [Adv.D.E. 1] (the "RER III Complaint") is attached as **Exhibit X**. The factual allegations and causes of action pled in the RER III Complaint mirror the allegations in the Petition in the Fraud Action which resulted in the entry of the Fraud Judgment, and the RER III Complaint requested that RER III's debt to the Plaintiffs be determined to be non-dischargeable under §§ 523(a)(2),[57] (4),[58] and (6)[59] and that RER III be denied a discharge under §§ 727(a)(2)-(5).[60]

60. RER III never answered the RER III Complaint. On September 12, 2024, the Plaintiffs filed their *Motion For Clerk's Entry of Default Judgment against Robert Eugene Roland III* [Adv.D.E. 4]. On September 13, 2024, a Clerk's Entry of Default [Adv.D.E. 8] was entered on the Docket of that adversary proceeding. The Plaintiffs then filed their *Motion For Final Default Judgment against Robert Eugene Roland III* [Adv.D.E. 9] on that day as well, and their *Brief in Support of Plaintiffs' Motion For Final Default Judgment Against Robert Eugene Roland III* [Adv.D.E. 12] on October 11, 2024. Then, on October 24, 2024, the Bankruptcy Court granted all of the relief that the Plaintiffs had been asking for when the Bankruptcy Court entered its *Order Granting Motion For Final Default Judgment Against Robert Eugene Roland III* [Adv.D.E. 16], *Findings of Fact and Conclusions of Law in Support of Final Judgment Against Robert Eugene*

---

[57] RER III Complaint, **Exhibit X** herein, ¶¶ 107-115, pp. 30-32.

[58] RER III Complaint, **Exhibit X** herein, ¶¶ 116-121, pp. 32-33.

[59] RER III Complaint, **Exhibit X** herein, ¶¶ 122-124, p. 34.

[60] RER III Complaint, **Exhibit X** herein, ¶¶ 125-126, pp. 34-35.

*Roland III* [Adv.D.E. 17], a copy of which is attached as **Exhibit Y**, and the Final Judgement Against Robert Eugene Roland III [Adv.D.E. 18], a copy of which is attached as **Exhibit Z**.

## V. CAUSES OF ACTION (DIRECT AND DERIVATIVE)

61. Three Global is a closely held limited liability company defined by the TEXAS BUSINESS ORGANIZATIONS CODE (the "TBOC").[61] Pre-suit notice for a derivative action as described at TBOC §§ 101.452–101.459, is inapplicable as to a closely held entity. Accordingly, the Plaintiffs may, and hereby do, assert the following claims against the Debtor in both Dickens, Shahan, and Dorrity's individual capacities and derivatively on behalf of Three Global. The Plaintiffs request that any judgment granted upon the claims made hereunder be paid either directly to Dickens, Shahan, and Dorrity or to Three Global, as justice and the protection of creditors' interests may require.[62]

62. This Amended Complaint, besides having Robert as a Defendant, adds his second and current wife, Elizabeth, who is Robert's co-Debtor in this Bankruptcy Case (and therefore also signed the Schedules and SOFA under penalty of perjury), and his first and former wife, Tina, as Defendants in this Adversary Proceeding as well. The reasons for this is that debts acquired by either spouse during the marriage are presumed to be community debts unless there is proof that the creditor agreed to look solely to the spouse's separate estate for the satisfaction. The spouse seeking to rebut the community property presumption bears the burden of proof to establish by clear and convincing evidence that the debt in question is a separate obligation and not a community obligation. In determining whether the spouse claiming to rebut the community debt obligation prevails, the trial court must examine the totality of the circumstances in which the debt

[61] TBOC § 101.463.
[62] TBOC § 101.463(c)(1)-(2).

arose and the consideration of implied assent to the debt by the other spouse. Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.[63] Any doubt is resolved in favor of a community designation not a separate designation.[64]

### A. COUNT 1 – BREACH OF FIDUCIARY DUTY

63. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

64. As a Manager of Three Global, Robert owed Three Global fiduciary duties, which included the general duties of loyalty, duty of care, duty of candor, duty of full disclosure, a duty of loyalty and utmost good faith,[65] a duty to refrain from self- dealing,[66] a duty not to usurp corporate opportunities for personal gain,[67] a duty to fully disclose personal interests in transactions with the company,[68] and a duty to use uncorrupted business judgment for the sole benefit of the company.[69] More specifically, in addition to Robert's position as governing person, Manager, Managing Member and Member of Three Global, because Robert occupied a special

---

63 Puente v. Puente, 2021, WL 1414218, at * 5 (Tex.App.-Houston [1st Dist.] 2021, no writ). Cockerham v. Cockerham, 527 S.W.2d 162, 171 (Tex. 1975). Marie v. Velasquez, 2008 WL 5082989, at * 1 (Tex.App.-San Antonio 2008, review denied). Viera v. Viera, 331 S.W.3d 195, at 205 (Tex.App.-El Paso 2011, no writ). McCoy v. McCoy, 2016 WL 3659122, at * 2 (Tex.App.-Fort Worth 2016, no writ). Matter of the Marriage of Williams, 202 WL 1146392, at * 1 (Tex.App.-Amarillo 2020, rehearing denied). Lindsey v. Lindsey, 2024 WL 3056038, at * 12 (Tex.App.-Corpus Christi 2024, review denied). Richardson v. Richardson, 424 S.W.3d 691, 697-698 (Tex.App.-El Paso 2014, no writ). See also TEXAS FAMILY CODE § 3.003(a) and (b).

64 Matter of the Marriage of Tyeskie, 558 S.W.3d 719, 723 (Tex.App.-Texarkana 2018, review denied). In re Matter of the Marriage of Moncey, 404 S.W.3d 701, 706 (Tex.App.-Texarkana 2013, rehearing overruled). Matter of the Marriage of Collinsworth, 598 S.W.3d 357, 364 (Tex.App.-Texarkana 2020, no writ). Bean v. Bean, 658 S.W.3d 401, 416 (Tex.App.-Dallas 2022, review denied). Robert and Tina were married on December 10, 1982 and their Divorce Decree, **Exhibit F** herein, was entered on July 27, 2015 (see p. 1).

65 Kinzbach Tool Co. v. Corbett-Wallace Corp., 160 S.W.2d 509, 512 (Tex. 1942) ("Kinsbach").

66 Dearing, Inc. v. Spiller, 824 S.W.2d 728, 733 (Tex. App.—Fort Worth 1992, writ denied) ("Dearing").

67 International Bankers Life Ins. v. Holloway, 368 S.W.2d 567, 577 (Tex. 1963) ("International Bankers").

68 General Dynamics v. Torres, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995, writ denied) ("General Dynamics").

69 International Bankers, 368 B.R. at 577.

place of confidence and trust as to the running of the finances, banking, and day to day business transactions and check signing of Three Global, Robert had a fiduciary relationship and owed fiduciary duties to the Plaintiff Three Global and the individual Plaintiffs Dorrity, Shahan and Dickens.

65. By making numerous self-dealing payments without the authorization or knowledge of the other Members and Managers of Three Global, utilizing Three Global funds, assets, and resources for personal enrichment, siphoning off Three Global's business and redirecting it to TDR, Industrial Oilfield, Total Supply and/or other of Robert's Companies, and in engaging in such other actions described herein, Robert breached these fiduciary duties to Three Global.

66. Robert's conduct breaches of the duties outlined above, proximately caused damages and injury to Three Global in the amounts of millions of dollars in actual damages for which the Plaintiffs now sue, directly and derivatively, and further plead for exemplary damages herein.

### B. COUNT 2 – BREACH OF CONTRACT

67. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

68. Three Global's Company Regulations (the "Company Regulations"), constituted a valid and enforceable contract between the Plaintiffs and Robert. A copy of the Company Regulations are attached as **Exhibit AA**. The Plaintiffs are proper parties to bring forth suit against Robert for various breaches of the Company Regulations.

69. The Plaintiffs performed under the terms of the Company Regulations.

70. The Company Regulations provided, *inter alia*, that the profits and losses of Three Global would be distributed on a *pro rata* basis.[70]

71. Robert's self-dealing payments from the Three Global coffers constituted direct and/or constructive distributions. Accordingly, Robert breached § 2.1(C) of the Company Regulations by not allowing Dickens, Shahan, and Dorrity to share *pro rata* in the distributions pursuant to their ownership interests.

72. The Company Regulations further provided that property owned or purchased by Three Global would be held, owned, and conveyed by Three Global, and that instrument providing for the disposition of property of Three Global would be valid only if executed after an agreement of a quorum of members.[71] By disposing of Three Global property without a quorum of the members of Three Global, Robert breached this provision of the Company Regulations.

73. The Company Regulations further prohibited members of the Three Global from undertaking or performing certain actions without written consent of all members, including but not limited to the following: (a) entering into a promise to pay any material written debts, liabilities or obligations for or on behalf of Three Global;[72] (b) making, executing or delivering for Three Global any bond, mortgage, deed of trust, guarantee, indemnity bond, surety bond or accommodation paper or accommodation endorsement;[73] (c) borrowing money in the name of Three Global or using Three Global's assets as collateral;[74] (d) assigning, transferring, pledging, compromising or releasing any claim of or debt owing to Three Global except upon payment in

---

70 Company Regulations, **Exhibit AA** herein, § 2.1(C) (allocating distributive shares *pro rata* among then-existing members). TBOC § 101.109(a) ("A person who is assigned a membership interest in a limited liability company is entitled to . . . receive any distribution the assignor is entitled to receive to the extent the distribution is assigned. ").

71 Company Regulations, **Exhibit AA** herein, § 8.1.

72 Company Regulations, **Exhibit AA** herein, § 1.2(A).

73 Company Regulations, **Exhibit AA** herein, § 1.2(D).

74 Company Regulations, **Exhibit AA** herein, § 1.2(E).

full;[75] and (e) agreeing to pay interest and set other terms of loans to Three Global from its members.[76]

74. By unilaterally causing Three Global to incur fraudulent payment obligations to TDR, 365 Outdoors, Ten 22, and Total Supply, Robert violated at least the foregoing provisions of the Company Regulations as well as other provisions to be proved at the trial of this matter, constituting multiple breaches of those provisions of the Company Regulations, and causing damage to the Plaintiffs for which the Plaintiffs now sue.

75. The Company Regulations further provided that generally accepted accounting principles would govern the Three Global's books, and that Three Global would maintain complete books and records of account.[77] By causing Three Global to incur fraudulent expenses, designating constructive distributions as expenses, and removing and/or destroying Three Global's books and records, Robert violated these provisions of the Company Regulations, constituting multiple breaches thereof, and causing damages to the Plaintiffs for which the Plaintiffs now sue.

76. By at least the breaches complained of herein and other breaches of the Company Regulations which may be proved at trial of this matter, Robert caused millions of dollars in actual damages to the Plaintiffs, for which the Plaintiffs now sue directly and derivatively. The Plaintiffs' injuries were a natural, probable, and foreseeable consequence of Robert's breaches of contract.

77. Because the breaches of contract by Robert occurred as a result of malice or through fraud, the Plaintiffs also seek an award of exemplary damages.[78]

---

[75] Company Regulations, **Exhibit AA** herein, § 1.2(F).
[76] Company Regulations, **Exhibit AA** herein, § 2.1(B).
[77] Company Regulations, **Exhibit AA** herein, §§ 3.1 and 4.1.
[78] See CPRC § 41.003(a).

### C. COUNT 3 – CIVIL CONSPIRACY

78. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

79. Between 2013 and 2016, Robert, RER III, Tinsley, and Robert's Companies pursued their unlawful course of action by ignoring their fiduciary duties and exploiting Robert's and RER III's positions of trust to enrich themselves by utilizing the Plaintiffs' assets for their own financial gain, making unauthorized, fraudulent, and self- dealing payments, and usurping the Plaintiffs' business. Robert, RER III, Tinsley, and Robert's Companies each became aware in a meeting of the minds that they desired to siphon money and resources from the Plaintiffs. Each formed the specific intent to assist the other in bringing about this objective.

80. Robert, RER III, Tinsley, and Robert's Companies were in an agreement to participate in a course of conduct directly in defiance of Three Global's Company Regulations, a contract and behavioral standard they each had actual knowledge of.

81. This agreement on a fraudulent course of conduct is evidenced by their pattern of repeatedly causing the Plaintiffs to make unauthorized and concealed transactions benefiting Robert, RER III, Tinsley, Robert's Companies, and individuals close to Robert and RER III.[79] Each of these unauthorized and concealed transaction were to the detriment of Plaintiffs.

82. Robert and RER, III, in their roles as fiduciaries of the Plaintiffs and involving Tinsley and Robert's Companies committed the following acts in furtherance of the conspiracy:

- Caused Three Global to pay millions of dollars in wages employee benefits, insurance premiums, payroll tax and arbitrary and capricious mark-ups on what was purported to be "payroll" at a time when Three Global had no employees;

---

[79] *See* Comcast Corp. v. Houston Baseball Partners, 627S.W.3d 398, 422–23 (Tex. App.—Houston [14th Dist.] 2021), affirmed, 671 S.W.3d 907 (Tex. 2023) (holding that repetition of misrepresentations was sufficient circumstantial evidence of common plan and intent).

- Withdrew funds from Three Global's operating account and deposited them into Robert's personal bank account;

- Shifted monies from Three Global to Robert's Companies to pay off Robert's personal loans and obligations and TDR's loans;

- Disgorged net cash proceeds from an illegitimate sale of equipment from Three Global to TDR;

- Authorized payments from Three Global to RER III's company, 365 Outdoors, and Tony Dry;

- Reimbursed or transferred funds from Three Global to TDR for owner draws purportedly from TDR, in whole or in part;

- Authorized automotive truck payments on a 2013 Dodge Ram financed through First Financial Bank for Robert (promissory note signed by Robert as a manager of Three Global) at a time when Robert was also already receiving a monthly "auto allowance;"

- Authorized transfers or deposits to RER III's personal accounts of the bulk of $386,000 for purportedly obtaining as an investment or loan for Three Global from Bill Stallings, when very little, if any, of the funds were deposited into the Three Global bank account or utilized for the business of Three Global, but rather were used for the personal benefit of and at the direction of RER III;

- Usurped Three Global's corporate opportunities wherein Robert and RER III coordinated the funneling and transferring of business opportunities of Three Global with Diamondback Energy, SM Energy, Trailridge, and Rock Oil to TDR and other companies and away from Three Global;

- Made suspect transfers and payments from Three Global for what is known as the Rock Oil jobs of in excess of $1 million;

- Assigned a factoring agreement for Three Global invoices, assigning the funds available from factoring Three Global invoices to TDR at the same time that Three Global made payments to the applicable factoring company;

- Paid for vehicles with Three Global's funds that were utilized by TDR;

- Deposited checks into the TDR operating bank account that were made out to pay Three Global;

- Booked the actual purchase of a ditcher transaction in QuickBooks as a "building sale" demonstrating the arbitrary, capricious and deceptive nature of Robert and RER III's bookkeeping practices; and

- Allowed for multiple other miscellaneous transfers from Three Global's accounts for personal expenses such as fitness charges, charges at Gebo's (a hunting and ranch supply store), western clothing and $10,000 in an unspecified transfer with no general ledger entry, and such transfers shown in Three Global's general ledger for the time period from April of 2015 through December 22, 2015, such transfers totaling in excess of $14,000.

83. As a direct and proximate cause of Robert's conspiracy with RER III, Tinsley, and Robert's Companies, the Plaintiffs sustained millions of dollars in damages for which they now sue the Debtor directly and derivatively.

### D. Count 4 – Aiding and Abetting

84. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

85. Robert, RER III, Tinsley, and Robert's Companies each participated in a scheme to enrich themselves by utilizing Three Global's assets for their own financial gain, making unauthorized, fraudulent, and self-dealing payments, and usurping Three Global's business.

86. Robert had actual knowledge that the conduct of RER III, Tinsley, and Robert's Companies as primary actors, constituted a tort by participating, observing, and reaping the financial benefits of the fraudulent acts. Robert agreed to a standard of conduct set by the Company Regulations but instead engaged in acts which contradicted and breached that standard. Robert, RER III, and Tinsley were all aware of the standard set in the Company Regulations.

87. Robert had intent to assist the tortious conduct of RER III, Tinsley, and Robert's Companies. Robert either participated in causing the fraudulent transactions to take place or failed to report them to Three Global as the person who possessed a fiduciary duty to do so.

88. By participating in the cause or failing to report the fraudulent transactions, Robert substantially assisted and encouraged RER, III Tinsley, and Robert's Companies to cause the torts complained of herein as they were allowed to continue their bad acts and receive considerable financial gain without any repercussions.

89. Robert's misconduct was a substantial factor in causing the misconduct of RER III, Tinsley, and Robert's Companies' actions. Robert was in a position of complete control over the administrative and financial aspects of Three Global's business. But for Robert's actions to either participate in the fraudulent activity or allow it to take place with no consequence, RER III, Tinsley, and Robert's Companies would not, and likely could not, have persisted in their fraudulent scheme.

90. As a direct and proximate cause of Robert aiding and abetting the actions of RER III, Tinsley, and Robert's Companies, the Plaintiffs sustained millions of dollars in damages for which they now sue Robert directly and derivatively.

**E. COUNT 5 – TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT**

91. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

92. TDR, 365 Outdoors, Ten 22, Industrial Oilfield and Total Supply were at all times relevant to this cause acting by and through their respective officers, directors, managers, members, governing persons and owners which included Robert.

93. Robert was aware of the Company Regulations, which constituted a valid contract between Three Global and himself.

94. Robert willfully and intentionally interfered with the contract by participating in and benefitting from his breaches of the Company Regulations.

95. By his tortious interference described above with the Company Regulations, Robert proximately caused millions of dollars in damages to Plaintiffs and the Plaintiffs suffered actual monetary damages and losses for which the Plaintiffs now sue directly and derivatively.

96. Because the tortious interference with an existing contract by Robert occurred as a result of malice or through fraud, the Plaintiffs also seek an award of exemplary damages.[80]

**F. COUNT 6 – CIVIL THEFT**

97. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

98. Three Global had a possessory right to the monies in its bank accounts and the property titled under its name. By taking funds and property of Three Global under false and fraudulent pretenses and without the knowledge or consent of the other Three Global members and managers, Robert unlawfully misappropriated Three Global's property.

99. Robert intended to withhold the misappropriated property permanently, and Robert intended to deprive Three Global of those monies and property.

100. Further, Plaintiffs Dickens, Shahan, and Dorrity had a possessory right to distributions of cash and profits of Three Global commensurate with their ownership interest in Three Global.

101. Robert's actions to divert funds and property away from Three Global, constituted disgorgement and deprived the Plaintiffs of profits and distributions of same from Three Global.

102. Robert intended to deprive those Plaintiffs of the funds and property transferred wrongfully away from Three Global.

---

80 CPRC § 41.003(a).

103. These acts constituted civil theft within the meaning of CPRC §§134.001 – 134.005.

104. As a result of Robert's civil theft, Plaintiffs suffered and sustained damages in the form of deprivation of property for which Plaintiffs now sue directly and derivatively for actual damages, $1,000 in statutory damages,[81] exemplary damages,[82] and for attorney fees.[83]

**G. COUNT 7 – FRAUD BY NON-DISCLOSURE**

105. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

106. Robert concealed materials facts from the Plaintiffs, such as the facts that (a) Three Global was not, in fact, operating at a loss, but was extremely profitable, (b) Three Global was making constructive distributions to Robert and RER III, (c) substantial payments were being made to TDR, 365 Outdoors, Ten 22, and Total Supply despite the fact that these companies were not providing goods or performing services for Three Global, (d) Three Global funds, property, and employees were being used for the benefit of TDR, 365 Outdoors, Ten 22, Industrial Oilfield, Total Supply, Tinsley, Robert and RER III, (e) that certain opportunities had been presented or made available to Three Global, (f) that Three Global's business opportunities were being funneled to TDR, Industrial Oilfield, and/or other companies of Robert, RER III and/or Tinsley, which were performing the available work and profiting from the same at Three Global's expense, (g) that Robert and RER III were providing Three Global with false invoices, (h) that Three Global was making excessive and fraudulent payroll payments to TDR at a time when Three Global had no employees, and (i) that TDR was "marking up" alleged payroll invoices to Three Global and

---

81 CPRC § 134.005.
82 CPRC § 41.008.
83 CPRC § 134.005.

charging a fee for processing payments from Three Global to TDR disguised as "payroll" payments to TDR, and many other QuickBooks transactions, cash withdrawals, and transfers of money and property away from Three Global as pleaded herein and to be proved at trial of this matter.

107. Robert knew that the Plaintiffs were ignorant of these facts and did not have an equal opportunity to discover these facts—indeed, Robert even took steps to make sure that the Plaintiffs could not discover these facts, as evidenced by Robert's misappropriation and/or destruction of Three Global's books and records, constituting spoliation of evidence as well as evidence of Robert's intent to defraud the Plaintiffs.

108. Robert was deliberately silent and failed to disclose the foregoing material matters concerning Three Global's business when Robert had a duty to disclose these facts to the Plaintiffs, both because Robert owed Three Global a fiduciary duty of candor and other fiduciary duties pleaded herein, and because Robert (a) created false impressions by making partial disclosures, and (ii) voluntarily disclosed some information, creating a duty to disclose the full truth. By failing to disclose these facts, Robert intended to induce the Plaintiffs to continue to remit payments to or for Robert's own benefit and to not investigate or take further action related to Robert's misconduct.

109. The Plaintiffs relied on these non-disclosures by forbearing from taking appropriate action, legal or otherwise, to recover depleted property and ensure the cessation of this unlawful conduct. Additionally, the Plaintiffs relied on these non-disclosures by remitting payments to or for the benefit of Robert. As a result, the Plaintiffs sustained millions of dollars in damages, for which they now sue directly and derivatively.

### H. COUNT 8 – COMMON LAW FRAUD

110. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

111. Robert knowingly made material misrepresentations as to (a) Three Global's financial status, and (b) the nature and scope of the work performed by Robert's Companies by representing that Three Global was operating at a loss and that the Debtor's Companies had provided goods and services, when in fact, Three Global was very profitable and all profits were being skimmed off to pay fraudulent invoices for goods and services which Robert's Companies were not actually performing or providing. Robert further represented that Three Global funds, property, and employees were being used for the benefit of Three Global when, in reality, such funds, property, and employees were being utilized for the own personal enrichment of Robert, RER III, and Tinsley as well as the enrichment of the Robert's Companies.

112. Robert represented to the Plaintiffs that Dickens, Shanan, and Dorrity would equally share in Three Global's distributions, despite the fact that Robert planned to make constructive and undisclosed distributions for Robert and the Fraud Judgment Defendants' exclusive benefit.

113. Robert further represented that Three Global was benefiting from company funds, property, and employees when, in reality, Three Global assets were being utilized for Robert's own personal enrichment or enrichment to Robert's Companies. Robert, together with the Fraud Judgment Defendants, represented that Three Global would perform water-related services and provide goods in a synergistic relationship with TDR's roustabout business when, in reality, they intended to use Robert's Companies to dismantle Three Global's business. Robert and Robert's Companies represented that the fraudulent invoices for their goods and services were legitimate.

114. Robert intended that the Plaintiffs rely upon these material misrepresentations and concealed acts. The Plaintiffs did actually rely on Robert's representations by, (a) agreeing to contribute capital and sweat equity to Three Global, (b) forbearing from taking obvious legal action to recover misappropriated funds, property, and corporate opportunities to prevent the ongoing continuation of such conduct, and (c) making payments to Robert's Companies or for Robert's benefit.

115. As a result of Plaintiffs' reliance, the Plaintiffs sustained millions of dollars in damages for which they now sue, directly and derivatively for actual damages, loss of benefit of the bargain damages as owners of Three Global, exemplary damages, and court costs, as well as a constructive trust on all funds and property wrongfully disgorged from the Plaintiffs.

**I. COUNT 9 – DTPA VIOLATIONS**

116. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

117. Three Global, acting under the Debtor's direction, sought to acquire goods and services from Robert's Companies TDR, 365 Outdoors, Ten 22, and Total Supply as evidenced by the numerous payments made from Three Global to Robert's Companies. At all material times relevant hereto, Three Global had assets totaling less than $25 million. Accordingly, Three Global was a consumer within the meaning of the Texas Deceptive Trade Practices Consumer Protection Act, TEXAS BUSINESS AND COMMERCE CODE § 17.01 *et seq*. (the "DTPA").[84]

118. Robert constitutes a person as that term is used in DTPA § 17.50(a)(1).[85]

---

[84] DTPA § 17.45(3).
[85] DTPA § 17.45(3).

119. Robert, acting in concert with the Fraud Judgment Defendants, committed numerous violations of the DTPA. Particularly, by presenting Three Global with fraudulent invoices describing goods and services which were never provided or performed and/or presenting Three Global with fraudulent invoices describing goods and services which were actually provided by Three Global itself, rather than Robert's Companies, Robert (a) passed off goods and services as those of another, (b) represented that goods and services had characteristics, ingredients, uses, benefits, or quantities which they did not have, (c) represented that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced, and (d) failed to disclose information concerning goods or services which was known at the time of the transaction when such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

120. These actions constitute violations of DTPA § 17.46(b)(1), (5), (22), and (24). Additionally, these acts and omissions constitute unconscionable actions and omissions that are actionable pursuant to DTPA § 17.50(a)(3).

121. As a result of these violations, the Plaintiffs sustained millions of dollars in actual damages, for which the Plaintiffs now sue Robert, directly and derivatively.

122. Further, since the acts were committed knowingly and intentionally, the Plaintiffs are entitled to treble damages, in addition to all other damages available under the DTPA, as provided by DTPA § 17.50(b)(1).

### J. COUNT 10 -- CONVERSION

123. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

124. Plaintiff Three Global owned and possessed the its funds, the work product of its employees, and the assets which it was entitled to. Plaintiffs Dickens, Shahan, and Dorrity had a right to immediate possession of a *pro rata* share of all distributions made by Three Global or all distributable funds held by Three Global.

125. Robert wrongfully exercised dominion or control of the personal property described above, unlawfully appropriating the same.

126. As a result, the Plaintiffs were deprived of the property, suffering millions of dollars in damages for which they now sue Robert, directly and derivatively.

**K. COUNT 11 – MONEY HAD AND RECEIVED**

127. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

128. Robert obtained money which belongs to the Plaintiffs in equity and good conscience. The constructive distributions, fraudulent payments, business usurpations, and illegitimate uses of Three Global's assets and funds for Robert's personal gain described herein resulted in Robert's possession of funds to which the Plaintiffs are rightfully entitled, to-wit, the proceeds from their joint business venture.

129. Accordingly, the Plaintiffs are entitled to recover from Robert the funds which belong to the Plaintiffs and were wrongfully received by Robert.

**L. COUNT 12 – UNJUST ENRICHMENT**

130. The Plaintiffs reallege the facts set forth in the preceding paragraphs and incorporate the same as if fully restated herein.

131. The Plaintiffs seek relief under the equitable doctrine of unjust enrichment, which holds that one who receives benefits unjustly should make restitution for those benefits. A person

is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage.

132. Here, Robert obtained millions of dollars in benefits by conveying funds, usurping corporate opportunities, generating and paying false invoices, and using Three Global's resources for personal gain, under false pretenses and by, while acting in concert, taking undue advantage of Robert's status as a fiduciary of Three Global.

133. More specifically, Robert acted in concert to funnel monies from Three Global to TDR at a time when the individual Plaintiffs received no distributions from Three Global and the individual Plaintiffs had no ownership interest in TDR.

134. As a result of this misconduct, Robert has obtained a benefit which would be unconscionable to retain.

**M. COUNT 13 – DECLARATORY JUDGMENT**

135. The Plaintiffs incorporate by reference the facts set forth above and fully incorporate the same herein verbatim.

136. Under Chapter 37 of the CPRC, the Plaintiffs petition this Court for a declaration regarding a justiciable controversy surrounding the acts of Robert in utilizing Three Global resources and assets for personal expenditures and diverting Three Global monies and assets to himself and the other Fraud Judgment Defendants.

137. The Plaintiffs request that this Court declare such personal expenditures, transfers of property and funds from Three Global to TDR, Robert, RER III and Robert's Companies as "constructive dividends" or "constructive distributions" in which the Plaintiffs Dickens, Shahan, and Dorrity should have received their *pro rata* share according to their ownership in Three Global.

138. The Plaintiffs also request that this Court declare that the individual Plaintiffs are entitled to a *pro rata* distribution based upon the amount of "constructive dividends" or "constructive distributions" Robert diverted for personal benefit and to unjustly enrich the Fraud Judgment Defendants from the Three Global operating account. The individual Plaintiffs request their distributions according to their then-current ownership in Three Global at the time of any such "constructive dividend" or "constructive distribution" as set forth in Three Global's Company Regulations as referenced above.

139. Furthermore, Plaintiffs Dickens, Shahan, and Dorrity request that the Court construe the Company Regulations of Three Global as well as other Three Global corporate documents showing the ownership percentages of Plaintiffs Dickens, Shahan, and Dorrity in Three Global, including the Certificate of Formation, Company Regulations, any tax returns showing K-1s and ownership percentages of Dickens, Shahan, and Dorrity and find and make declarations as to the following:

- The amount of the actual Three Global cash distributions made during calendar years 2013 through 2016 to which the Plaintiffs Dickens, Shahan, and Dorrity are entitled to are their *pro rata* share according to their Three Global ownership under the Company Regulations, the TBOC, and the other corporate documents and tax returns showing their ownership of Three Global;

- The exact amount of Robert's personal and non-business expenditures and transfers from Three Global, including from the Three Global operating account, and a finding that such expenditures were constructive distributions to Robert; and

- The exact amount of Plaintiffs Dickens, Shahan, Dorrity *pro rata* share of the constructive distributions made by Robert from Three Global;

140. Under CPRC § 37.009, the Plaintiffs are entitled to recover from Robert the Plaintiffs' reasonable and necessary attorney's fees incurred in bringing this request for declaratory judgment.

### N. COUNT 14 – THE NON-DISCHARGEABILITY OF THE PLAINTIFFS' CLAIMS AGAINST THE DEBTORS UNDER § 523(A)(2)

141. The Plaintiffs incorporate and re-allege the allegations set forth in the paragraphs above in this Complaint as if set forth at length herein.

142. Section 523(a)(2) provides, in relevant part, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
> . . .
>
> (2)(A) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing–
>
> (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive . . .

143. Counts 1 through 13 above constitute non-dischargeable claims under Section 523(a)(2).

144. These include, without limitation, Robert's false and material misrepresentations as to (a) Three Global's financial status, and (b) the nature and scope of work performed by Robert and Robert's Companies by representing that Three Global was operating at a loss and that Robert's Companies had provided goods and services to Robert, when in fact, Three Global was very profitable and all profits were being skimmed off to pay fraudulent invoices to Robert's Companies for goods and services that were not actually provided or performed.

145. Robert represented to Plaintiffs that Dickens, Shanan, and Dorrity that they would equally share in Three Global's distributions, despite the fact that Robert planned to make constructive and undisclosed distributions for Robert and the Fraud Judgment Defendants' exclusive benefit.

146. Robert further represented that Three Global was benefiting from company funds, property, and employees, when in reality, those Three Global assets were being utilized for Robert's own personal enrichment and/or enrichment to Robert's Companies. Robert, together with the Fraud Judgment Defendants, represented that Three Global would perform water-related services and provide goods in a synergistic relationship with TDR's roustabout business, when in reality, they intended to use Robert's Companies to profit off of and dismantle Three Global's business. Robert and Robert's Companies represented that the fraudulent invoices for their goods and services were legitimate.

147. Robert intended that the Plaintiffs rely upon these material misrepresentations and concealed acts. The Plaintiffs did actually rely on Robert's misrepresentations by, (a) agreeing to contribute capital and sweat equity to Three Global, (b) forbearing from taking obvious legal action to recover misappropriated funds, property, and corporate opportunities to prevent the ongoing continuation of such conduct, and (c) making payments to Robert's Companies and/or for Robert's benefit.

148. In addition to Robert's intention, as the owner, manager, and/or governing agent of TDR, 365 Outdoors, Ten 22 Industrial Oilfield, and/or Total Supply, Robert is responsible for the fraud of Robert's Companies and ultimately received the monetary benefit therefrom.[86]

---

[86] *See* In re Valdineia F. Desouza, 2024 WL 1739526, *5–6. (Bkrtcy. E.D. Tex. Apr. 23, 2024) ("523(a)(2)(A) can extend to liability for fraud that a debtor did not personally commit" quoting Kahkeshani v. Hann (In re Hann), No. 22-20407, 2023 U.S. App. LEXIS 27447, at *14 (5th Cir. 2023)).

149. As a result of the Plaintiffs' reasonable reliance, the Plaintiffs sustained millions of dollars in damages for which they now sue, directly and derivatively for actual damages, loss of benefit of the bargain damages as owners of Three Global, exemplary damages, and court costs, as well as a constructive trust on all funds and property wrongfully disgorged from Plaintiffs.

### O. COUNT 15 -- THE NON-DISCHARGEABILITY OF THE PLAINTIFFS' CLAIMS AGAINST THE DEBTORS UNDER § 523(A)(4)

150. The Plaintiffs repeat and re-allege the allegations set forth in paragraphs above in this Complaint as if set forth at length herein.

151. Section 523(a)(4) provides, in relevant part, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

152. Counts 1 through 13 above constitute non-dischargeable claims under § 523(a)(4) as it is a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of § 523(a)(4).

153. As the Manager of Three Global, Robert owed Three Global fiduciary duties, which included the general duties of loyalty, duty of care, duty of candor, duty of full disclosure, a duty of loyalty and utmost good faith,[87] a duty to refrain from self- dealing,[88] a duty not to usurp corporate opportunities for personal gain,[89] a duty to fully disclose personal interests in transactions with the company,[90] and a duty to use uncorrupted business judgment for the sole

[87] Kinzbach, 160 S.W.2d at 512.
[88] Dearing, Inc. v. Spiller, 824 S.W.2d 728, 733 (Tex. App.—Fort Worth 1992).
[89] International Bankers, 368 S.W.2d at 577.
[90] General Dynamics v. Torres, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995).

benefit of the company.[91] More specifically, in addition to Robert's position as governing person, manager, managing member and member of Three Global, because Robert occupied a special place of confidence and trust as to the running of the finances, banking, and day to day business transactions and check signing of Three Global, Robert had a fiduciary relationship and owed fiduciary duties to the Plaintiff Three Global and the individual Plaintiffs Dickens, Shahan and Dorrity.

154. By making numerous self-dealing payments without the authorization or knowledge of the other members and managers of Three Global, utilizing Three Global funds, assets, and resources for personal enrichment, siphoning off Three Global's business and redirecting it to TDR, Industrial Oilfield, Total Supply and/or other of Robert's Companies, Robert breached these fiduciary duties to Three Global.

155. Robert's conduct constitutes breaches of the duties outlined above, proximately caused damages and injury to Three Global in the amounts of millions of dollars in actual damages for which, Plaintiffs now sue, directly and derivatively, and further plead for exemplary damages herein.

## P. COUNT 16 -- THE NON-DISCHARGEABILITY OF THE PLAINTIFFS' CLAIMS AGAINST THE DEBTORS UNDER § 523(A)(6)

156. The Plaintiffs repeat and re-allege the allegations set forth in paragraphs above in this Complaint as if set forth at length herein.

157. Section 523(a)(6) provides, in relevant part, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> ## ## ##

---

[91] International Bankers, 368 S.W.2d at 577.

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity …

158. Counts 1 through 13 above constitute non-dischargeable claims under § 523(a)(6) due to the Debtor's willful and malicious injury to the Plaintiffs and their property.

**Q. COUNT 17 – OBJECTION TO THE DEBTORS' DISCHARGE UNDER §§ 727(A)(2), (4) AND (5)**

159. The Plaintiffs repeat and re-allege the allegations set forth in paragraphs above in this Complaint as if set forth at length herein.

160. The Debtors' Matrix, Schedules and SOFA are inaccurate on account of the Debtors willfully and intentionally:

- Failing and refusing to list and schedule the Plaintiffs Dickens, Shahan and Dorrity as creditors on their Schedules even though the Plaintiffs Dickens, Shahan and Dorrity had tried the Fraud Action against Robert and the other FraudJudgment Defendants 2 weeks prior to the Petition Date, Robert received the State Court Letter 9 days before the Petition Date and Robert had the Fraud Judgment entered against him 5 days before the Petition Date;

- Listing and scheduling the incorrect law firm (Davidson Sheen, a law firm that had closed its doors and gone out of business) for all of the Plaintiffs so as not to provide all of the Plaintiffs actual notice of the Bankruptcy Case since they were known creditors of the Debtors, instead of listing the correct law firm of the Plaintiffs (B&G, the law firm that had tried the Fraud Action against Robert, the law firm that was listed on the State Court Letter along with Robert and that had been counsel for the Plaintiffs in the Fraud Action for approximately an entire year before the Fraud Action was actually tried);

- Answering Part 5, Question No. 13 of their SOFA, which asks whether within two (2) years before the Petition Date, whether the Debtors gave any **gifts** with a total value of more than $600 per person, by checking the box for "none."[92] With Robert transferring the Real Property to his son-in-law for the consideration of love and affection, nine (9) days before the Debtors filed this Bankruptcy Case, the Debtors checking the box "none" was incorrect and false. This transfer was nothing other than a gift. The verity of this is made more obvious by the fact that the Deed has the word "**gift**" in its title, General Warranty **Gift** Deed.

---

92 SOFA, **Exhibit J** herein, Part 5 Question 13 (emphasis added).

- Answering Part 7, Question No. 18 of their SOFA, which asks whether within two (2) years before the Petition Date, whether the Debtors sold, traded, or otherwise transferred any property to anyone, other than property transferred in the ordinary course of business or financial affairs, the Debtors checked the box for "no."[93] With Robert transferring the Real Property to his son-in-law for the consideration of love and affection, nine (9) days before the Debtors filed this Bankruptcy Case, the Debtors checking the box "no" was incorrect and false. This transfer was not in the Debtors' ordinary course of business or financial affairs

- Answering Part 11, Question No. 27 of their SOFA, which asks whether **within 4 years before the Petition Date**, whether the Debtors owned a business or have any of the following connections to any business (e.g., (a) a sole proprietorship or self-employed in a trade, profession, or other activity, either full time or part time; (b) a member of a limited liability company (LLC) or limited liability partnership (LLP); (c) a partner is a partnership; (d) an officer, director, or managing executive of a corporation; and/or (e) an owner of at least 5% of the voting or equity securities of a corporation), the Debtors checked the box "no." This was incorrect and false. Robert was a Manager of Three Global and Three Global was duly organized and existing under the laws of the state of Texas within 4 years of the Petition Date.[94] Robert was a Director of TDR and TDR was duly organized and existing under the laws of the state of Texas within 4 years of the Petition Date.[95] And, in addition, the Debtors had their own consulting business, Robert Roland Consulting.[96]

161. These bad acts qualify as the necessary prerequisites to deny the Debtors a discharge. Under § 727(a)(2):

> (a) The court shall grant the debtor a discharge, unless –
>
> ## ## ##
>
> (2) the, debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred,

---

93 SOFA, **Exhibit J** herein, Part 7 Question 17.

94 See Three Global's *Certificate of Formation For a Limited Liability Company*, dated May 2, 2008, a copy of which is attached as **Exhibit T**, and a summary of the filings regarding Three Global with the Office of the Secretary of State of Texas, a copy of which is attached as **Exhibit U**.

95 See TDR's Certificate of Formation of TDR Services, Inc., dated June 21, 2006, a copy of which is attached as **Exhibit V**, and a summary of the filings regarding TDR with the Office of the Secretary of State of Texas, copy of which is attached as **Exhibit W**.

96 Assumed Name Certificate, **Exhibit R-1** herein.

removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

(A) property of the debtor, within one year before the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition; . . .

162. With Robert transferring the Real Property to his son-in-law for the consideration of love and affection on the day Robert received the State Court Letter, 4 days before the entry of the Fraud Judgment against him and 9 days before he and Elizabeth filed this Bankruptcy Case, and with the Debtors failing and refusing to acknowledge that transfer on their SOFA despite multiple places to do so, they most definitely breached and violated § 727(a)(2)(A) and should be denied a discharge for that reason alone.

163. Section 727(a)(4) reads in as follows:

(a) The court shall grant the debtor a discharge, unless –

## ## ##

(4) the debtor knowingly and fraudulently, in or in connection with the case –

(A) made a false oath or account;

(B) presented our used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

164. The Debtors made multiple false oaths with respect to their SOFA in breach and violation of § 727(a)(4)(A). They deliberately, intentionally and cold-bloodedly answered Part 5 Question No. 13, Part 7 Question No. 18, and Part 11 Question No. 27 incorrectly. The Debtors

knew the right answers but they falsely provided the wrong answers. And they did this under penalty of perjury. In addition, Robert's multiple instances of fraudulent conduct in extracting money from Three Global and the individual Plaintiffs, Dickens, Shahan and Dorrity, as explained above, are ample evidence of his serial breaches and violations of § 727(a)(4)(C). The Debtors' countless infractions of § 727(a)(4)(A) and (C) are reasons enough to deny them a discharge under those provisions alone.

165. Under § 727(a)(5), the court shall grant the debtor a discharge unless the debtor has failed to explain satisfactorily, before determination of denial of discharge, any loss of assets to meet the debtor's liabilities. The Debtors' lack of a viable, credible or believable explanation with respect to transferring the Real Property to their son-in-law for the consideration of love and affection on the day Robert received the State Court Letter, 4 days before the entry of the Fraud Judgment against Robert, and 9 days before the Debtors filed this Bankruptcy Case is an overt and clear indication that they breached and violated § 727(a)(5) and should be denied a discharge for that reason alone.

166. Accordingly, the Plaintiffs object to the Debtors' discharge under § 727(a)(2), (4) and (5).

## VI. Attorney's Fees and Costs

167. The Plaintiffs seek attorneys' fees and court costs (including but not limited to filing fees, service fees, expert fees and costs, as well any and all other court costs) under Article 11.3 of the Company Regulations, CPRC §§ 30.001, 134.005, and TBCC §17.50(d), and as otherwise may be recoverable by law.

168. Additionally, with respect to all claims stated for which recovery of attorney's fees is not expressly authorized by contract or statute, the Plaintiffs maintain that they are nonetheless

entitled to recovery of attorneys' fees with respect to such claims, as such claims are inextricably conjoined with successful prosecution of the breach of contract, DTPA, and civil theft claims herein.

## VII. CONCLUSION

169. There is no question whatsoever about what the Debtors did to the Plaintiffs and that what they did was voluntary, intentional, deliberate, fully informed and done "eyes open." Their transgressions are amply documented and more than warrant the determination that their debts to the Plaintiffs are non-dischargeable as well as a denial of their discharge.

## VIII. PRAYER

The Plaintiffs pray that upon a final trial of this matter, the Plaintiffs be awarded all of the damages judgments that that are entitled to against the Defendants including, without limitation, an Order or Judgment:

a. Determining the amount of the Plaintiffs claims against the Defendants;

b. Determining that the Plaintiffs claims against the Debtors are non-dischargeable under § 523;

c. Denying the Debtors' discharge under § 727;

d. Awarding the Plaintiffs such other and further relief, special or general, at law of in equity, as this Court may deem just and proper.

Respectfully submitted,

/s/ Seymour Roberts, Jr.

**Seymour Roberts, Jr.**
Texas State Bar No. 17019150
sroberts@fflawoffice.com

**FRIEDMAN & FEIGER, LLP**
Dominion Plaza West
17304 Preston Road, Suite 300,
Dallas, Texas 75252
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

**ATTORNEYS FOR THREE GLOBAL, LLC, JESSE DICKENS, REED SHAHAN AND CHUCK DORRITY**